[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 96-6084
_____
D. C. Docket No. 94-PT-2018-S

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Counter-
Defendant-Appellant,

versus

RICHARD F. ADLER,

Defendant-Appellee,

PHILLIP L. CHOY, MAGATRONIC TRADING,
LIMITED, DOMER L. ISHLER,

Defendants-Counter-
Claimants-Appellees,

HARVEY L. PEGRAM,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____
**(March 27, 1998)**

Before ANDERSON and COX, Circuit Judges, and ALARCON*, Senior Circuit Judge.

ANDERSON, Circuit Judge:

_____
*Honorable Arthur L. Alarcon, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

In this case, the appellant Securities and Exchange Commission ("SEC") brought a civil action against appellees Harvey L. Pegram, Richard F. Adler, Philip L. Choy, Magatronic Trading Limited,[1] and Domer L. Ishler, alleging violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; and § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a). The SEC seeks treble damages for these alleged violations under the Insider Trading Sanctions Act of 1984, 15 U.S.C. § 78u-1. The SEC argues that Pegram engaged in illegal insider trading in September 1989. The SEC argues that not only Pegram, but also the other appellees engaged in illegal insider trading in November 1992. We reverse and remand.

## I. FACTS AND PROCEDURAL HISTORY

A. Pegram's 1989 Transactions

In 1984, Harvey Pegram, along with two business associates, founded Comptronix Corporation ("Comptronix"), which provides contract manufacturing services to original equipment manufacturers in the electronics industry. At that time, Pegram was made Vice President of Purchasing and Material Management for Comptronix, and a member of its Board of Directors. Pegram was also issued 869,897 shares of Comptronix Common

---

[1] Magatronic Trading, Limited is a company owned by Philip Choy and on behalf of which Choy traded his Comptronix stock. A default judgment was entered against Magatronic on November 30, 1995, in the amount of $75,000. This default judgment has not been appealed.

Stock.  In May 1989, Comptronix made an initial public offering of its stock.  In the years

prior to the initial public offering, the relationship between the Comptronix founders

"disintegrated."  In July 1989, Pegram was removed from his position as Vice President of

Purchasing and Material Management and made Vice President of Marketing.  On August

23, 1989, Pegram sued Comptronix and William Hebding, who was at that time the

Chairman and CEO of Comptronix, seeking a declaratory judgment and damages.[2]

Immediately after Pegram's complaint was filed, Hebding asked Pegram to take an

indefinite leave of absence from Comptronix and to cease contact with Comptronix

customers.  Pegram was eventually terminated in December 1989.

During the early part of 1989, Comptronix began receiving decreased orders from

one of its largest customers, Conner Peripherals ("Conners").  On August 31, 1989,

Comptronix issued a press release stating that it had "received less than anticipated orders

from another major customer for disk drive products.  As a result, management expects

that sales and earnings for the second half of 1989 will be lower than previously

anticipated, but still significantly higher than the levels of the previous year."  On

September 14, 1989, Pegram attended a meeting of the Comptronix Board of Directors.

Pegram contends that "nothing new of a material nature" was said regarding the Conners

---

[2]In his complaint, Pegram alleged that Comptronix had breached its employment contract with him, that Hebding had misrepresented facts to Pegram concerning the operation of Comptronix, and that Hebding had tortiously interfered with Pegram's employment contract.

account at this meeting, other than a statement reflected in the notes of Joe Ritch, the

secretary and general counsel of Comptronix, that "Conners shaky possibly all business

offshore." The SEC contends, and the revised minutes of the Board meeting reflect,[3] that

Comptronix's CEO, William Hebding, reported to the Board that

> The Company was expecting either a complete termination or a substantial reduction in the orders from Conners, which is the largest customer of the Company due to Conner moving much of its manufacturing off-shore. Mr. Hebding stated that because Conners was the Company's largest customer, when the information was disseminated the stock of the Company would likely drop substantially.

Therefore, during the September 14 Board meeting, the Board adopted a resolution

authorizing the company to purchase up to one million shares of its own stock in order to

support public confidence in the company.[4]

On September 19 through September 26, 1989, Pegram sold 20,000 shares of

Comptronix stock. On October 6, 1989, Comptronix issued a press release stating that the

company "had received less than anticipated orders from a major customer for disk drive

---

[3]Pegram alleges that the revised minutes of the Board meeting were "doctored" by William Hebding in order to make it appear that Pegram obtained material nonpublic information at the Board meeting.

[4]Pegram introduced evidence that at the September 14 Board meeting, Comptronix did not know with certainty how many orders Comptronix would or would not receive from Conners, and that after the September 14 Board meeting, Hebding met with Conners' president who reassured Hebding that Comptronix would still be able to compete for Conners' orders. However, Comptronix soon learned that they would receive little or no business from Conners.

products," the company "expect[ed] orders from this customer to decline even further in the fourth quarter [of 1989]," and that "[a]s a result, Comptronix anticipates that sales and earnings in the fourth quarter will be below the levels in the same period of 1988."[5] In response to the Comptronix press release, the price of Comptronix stock dropped from $3.63 to $2.63 over the next two trading days. The SEC maintains that by selling 20,000 shares of Comptronix stock before the October 6 press release, Pegram avoided $17,625 in losses.

Pegram contends that his September 1989 sales of Comptronix stock were not made as a result of any alleged material nonpublic information, but were part of a preexisting plan to sell Comptronix stock in order to buy an eighteen wheel truck for his son's business. First, Pegram emphasizes that he waited until September 19 to sell 20,000 shares of Comptronix stock because of a 120-day "lock-up" period following the initial public offering of Comptronix stock on May 19.[6] In an affidavit, Kenneth M. Sproul, Pegram's stockbroker, stated that on September 1, 1989, Pegram discussed his intention of

---

[5]Pegram contends that an amended press release was issued by Comptronix on that same day which stated that 1989 fourth quarter sales for Comptronix were expected to be higher than 1988 fourth quarter sales. The SEC alleges that no such amended release was issued and Pegram did not produce any evidence of this purported amended press release.

[6]This lock-up agreement prevented Comptronix officers and directors from selling any shares of Comptronix stock until 120 days after the initial public offering of Comptronix stock on May 19, 1992.

selling 20,000 shares of Comptronix stock and that Sproul informed Pegram that the 120-day lockup agreement with Comptronix's underwriters would expire on September 14, 1989. Furthermore, as required by Comptronix company policy, Pegram obtained approval for a sale from Joe Ritch, Comptronix's general counsel on August 4, and September 16, 1989.[7] Finally, Pegram emphasizes that he sold only 20,000 of his 869,897 shares of Comptronix stock.

The district court granted Pegram's motion for summary judgment regarding the 1989 transactions in an unpublished order on May 2, 1995. After concluding that it was "questionable" whether the information Pegram acquired at the September 14 Board meeting was "material," the district court found that Pegram "rebutted any reasonable inference that he acted with scienter as is required under § 10(b), § 17(a), and Rule 10b-5" because (1) Pegram did not sell a significant portion of his stock; (2) Pegram's intention to sell was known by the general counsel of Comptronix; and (3) Pegram sold the Comptronix stock immediately after the lock-up period following Comptronix's initial public offering.

B. 1992 Transactions of Pegram, Choy, and Ishler

---

[7]Joe Ritch was also a board member and the corporate secretary of Comptronix. Ritch attended and prepared the minutes of the September 14 Board meeting. When asked why he interposed no objection when told of Pegram's proposed sale, and whether he believed Pegram possessed material nonpublic information at the time, Ritch stated that he "really did not think of it in those terms."

On November 15, 1992, the Comptronix Board of Directors held a special meeting that was attended by Richard Adler, an outside director of Comptronix, by telephone from Taiwan. None of the other appellees were present at this meeting. At the Board meeting, the Comptronix directors were informed about potential fraud in which Comptronix CEO and President William Hebding, President Allen Shifflet, and Treasurer Paul Medlin allegedly made $4 million in false accounting entries in order to support certain capitalized costs of the company. At this meeting, the Comptronix Board designated a Special Committee, of which Adler was a member, to oversee an investigation into the scheme.[8] After a week of investigation, another meeting of the Board of Directors was held on November 23, 1992, and the directors were informed that $16 million in false accounting entries had actually been made, that there were not legitimate capitalizable costs to offset these false entries, and that Comptronix's sales records and earnings had been misstated. Therefore, on November 25, 1992, Comptronix publicly announced that Hebding, Shifflet, and Medlin were suspended from all decision-making responsibilities at Comptronix and that the

> Board of Directors has formed a Special Committee to investigate certain matters relating to the Company's financial statements. Based upon preliminary findings, the Special Committee believes that since 1989, certain members of the Company's senior management have caused the Company to overstate gross profit by improperly recording certain assets on its balance sheet and either overstating current sales or understating current

---

[8]The Comptronix directors were expressly advised that they must keep the information they learned at the Board meeting secret and confidential.

cost of sales on its income statement.  There will likely be material adjustments to the Company's historically audited financial statements.

This announcement resulted in a suspension of trading in Comptronix securities.  When trading resumed by the end of the day, Comptronix common stock had lost 72 percent of its value, dropping from a closing price of $22 per share on November 24 to a closing price of $6 1/8 per share on November 25.

Richard Adler has maintained a social and business relationship with Harvey Pegram for over thirty years.  On November 16, 1992, the day after Adler first learned of the potential fraud at Comptronix, Pegram, who was no longer an officer or director of Comptronix, placed a call to Adler's home in Taiwan at 7:53 a.m., Central Standard Time. Phone records indicate that this call lasted 72 seconds.[9]  At 7:55 a.m., Pegram called his wife, Margie Pegram, at home.  Margie Pegram called the Pegrams' stock broker at approximately 8:07 a.m. and placed an order to sell 50,000 shares of Comptronix stock at a limit price of $21 per share or better from a joint account she held with her husband. Between November 16 and November 24, 1992, the Pegrams sold 150,000 shares of Comptronix common stock.  The SEC contends that Adler tipped Pegram in the early morning call on November 16, 1992, and that the Pegrams avoided losses of $2,315,375.

Harvey Pegram contends that the Pegrams' sale of Comptronix stock in November 1992 was made pursuant to a preexisting plan to sell 150,000 shares of Comptronix after

---

[9]Later that same day, Pegram placed a second call to Adler at 4:26 p.m. that lasted 114 seconds.

the November 3 presidential election. During the summer of 1992, the Pegrams decided to sell 150,000 of their 400,000 shares of Comptronix stock based on their stockbroker's recommendation that they "diversify" their stock holdings.[10] In August of 1992, the Pegrams' tax planner computed the taxes on selling 150,000 shares and advised them to sell the shares in the fourth quarter of 1992. There is evidence that the Pegrams were planning to sell the shares after the November 3 presidential election, but the illness and death of Mrs. Pegram's father delayed the sale. Mrs. Pegram returned from her father's funeral on Friday, November 13, and she testified that November 16, the date of their first sale of Comptronix stock, was the first opportunity she had to contact her stockbroker. The Pegrams also emphasize that their 1992 sale of 150,000 shares of Comptronix stock was "consistent" with their sale of 60,000 Comptronix shares in 1990 and 380,000 Comptronix shares in 1991.

The Pegrams also testified that Mr. Pegram's phone call to Mrs. Pegram on November 16 was a "wake-up" call and that Mr. Pegram made no mention of a phone call to Adler nor of any fraud at Comptronix.[11] Pegram testified that between December 1991

---

[10]Both Mr. and Mrs. Pegram testified that the Pegrams debated about whether to sell 250,000 or 150,000 shares of Comptronix stock. Mrs. Pegram wanted to sell 250,000 shares, but they eventually decided to sell only 150,000 shares.

[11]The Pegrams testified that their first knowledge of any fraud at Comptronix came on November 25, 1992, the date of Comptronix's public announcement, and at that time, they still owned approximately 250,000 shares of Comptronix stock. The value of the Pegrams'

and December 1992, he frequently contacted Adler concerning requests for price quotes on electronic parts and materials that Pegram needed for his business, BST Manufacturing,[12] and that his phone calls to Adler on November 16 related to these price quotes.[13] Therefore, Pegram argues that he did not possess material nonpublic information about Comptronix when he and his wife sold 150,000 shares of Comptronix stock between November 16 and November 24, 1992.

The SEC also contends that Pegram tipped two business associates, Philip L. Choy and Domer L. Ishler,[14] who then traded on the information. On November 16, 1992, the same day of the call from Pegram to Adler, Pegram made a call to Choy at Magatronic

---

remaining shares dropped approximately $4 million the day of Comptronix's public announcement.

[12]After being discharged by Comptronix in December 1989, Pegram purchased BST Manufacturing, Inc., a small company which assembled electronic control boards, in December 1991.

[13]On November 5, 1992, Adler sent a facsimile to Pegram regarding an earlier facsimile from Pegram in which Pegram sought price quotes on electronic parts. Pegram testified that he did not have an opportunity to review and respond to Adler's facsimile until November 16 because of the death of his father-in-law. Pegram testified that the electronic parts, which were scarce and difficult to obtain, were ultimately purchased by BST from a company which Adler worked with to obtain and supply "difficult to locate" electronic parts.

[14] Pegram, Adler, Ishler, and Choy, in addition to being business associates, also saw each other socially on occasion.

Trading, Ltd. in Hong Kong at 8:02 p.m.[15] At 9:39 p.m. that evening, Choy telefaxed the brokerage firm for his company and directed its stockbroker to sell 5000 shares of Comptronix stock at a price of "US$21/22" per share. This order was executed on November 17 and 19, and the SEC contends that Choy and Magatronic avoided losses of approximately $75,000 by selling Comptronix stock while in possession of material nonpublic information. Choy and Pegram both testified that Pegram's phone call to Choy on the evening of November 16 was related to price quotes for Pegram's business and that Comptronix was not discussed by the parties. Pegram testified that he frequently contacted Choy, a Hong Kong businessman, from December 1991 through January 1993 in order to obtain prices on electronic parts for BST Manufacturing.

The SEC contends that Domer Ishler was tipped by either Pegram or Adler. On November 15, 1992, Ishler called Adler while Adler, by telephone, was participating in the special Comptronix Board meeting regarding the potential fraud at Comptronix. Adler and Ishler both testified that Adler put the Board meeting on hold and told Ishler that he could not talk with him and that Adler would call Ishler later. After a series of missed connections, Ishler reached Adler on November 23 while Adler was in the U.S. for a Comptronix board meeting. Ishler and Adler both testified that in this call Adler told Ishler that he was in a meeting and that as soon as he knew his schedule, Adler would call Ishler so they could "get together". The SEC contends that Ishler was tipped about the

---

[15]This call lasted 4 minutes and 42 seconds.

fraud at Comptronix during one of his two phone calls with Adler or during a November

23, 1992, phone call with Pegram,[16] and that on November 24, Ishler purchased 300 "put

options" in Comptronix stock based on this inside information.[17]  Ishler eventually

realized gains approximating $368,750 when he exercised the options after Comptronix's

public announcement on November 25, 1992.

---

[16]On November 23, 1992, one week after Pegram was allegedly tipped by Adler, Ishler called Pegram at his home at 11:23 p.m., and they had a conversation that lasted approximately twenty-five minutes.  The SEC contends that Pegram revealed inside information about the fraud at Comptronix during this call.  Pegram and Ishler both contend Ishler called Pegram in order to determine the whereabouts of Adler.

[17]Ishler purchased these put options for approximately $21,000.  The put options gave Ishler the right to sell 30,000 shares of Comptronix stock at $20 a share and the options expired in three weeks.  When Ishler purchased the options, Comptronix was trading at $22 ½ per share and thus unless the price of the stock fell below $20 a share, Ishler would lose his $20,000 investment.  Ishler testified that he went to the stockbroker on November 24 in order to sell a thousand shares of Comptronix "short" because he believed the price of Comptronix stock would drop a few dollars a share.  Ishler and his broker both testified that they discussed the stock of two other companies that were in a similar line of business as Comptronix.  After writing out the ticket to sell Comptronix short, either the broker or Ishler mentioned buying put options because selling short would not have been nearly as profitable as buying put options.  Ishler had purchased put options in 1990 with the same broker, and the broker testified that Ishler had a history of buying "highly speculative, high risk, leverage type" stocks in industries similar to Comptronix.

In its May 2, 1995, order granting summary judgment to Pegram in regard to his

1989 transactions, the district court denied Pegram's motion for summary judgment with

regard to the 1992 transactions because the timing of the telephone calls between the

appellees raised "a reasonable inference of materiality and scienter on the part of the

defendant [Pegram]." Therefore, the 1992 claims went to trial. However, after a seven

day jury trial, the jury was unable to reach a verdict and the district court declared a

mistrial. The appellees then filed renewed motions for judgment as a matter of law and

the district court granted the motions in an October 24, 1995, order.[18] In granting

Pegram's motion for judgment as a matter of law, the district court concluded that the

calls from Pegram to Adler, from Pegram to his wife, and from Pegram's wife to her

stockbroker, raised a "possible reasonable inference" that Pegram received inside

---

[18]In this order, the district court allowed Ishler time to convince the court that he had timely filed an initial motion for judgment as a matter of law and/or to file a motion for summary judgment. In order for a court to consider a renewed motion for judgment as a matter of law, the moving party must have made a motion for such a judgment under Rule 50(a) at the close of all the evidence. Austin-Westshore Const. Co. v. Federated Dept. Stores, Inc., 934 F.2d 1217, 1222 (11th Cir. 1991); Fed. R. Civ. P. 50(b). Because the SEC alleged that Ishler had not timely filed his initial motion for judgment as a matter of law at the close of evidence, Ishler filed a submission to establish that his initial motion for judgment as a matter of law had been timely filed. Ishler also filed a motion for summary judgment. On December 6, 1995, the district court entered an order granting Ishler's motion for summary judgment based on all the evidence introduced at trial.

13

information from Adler, but "any such inference" was rebutted by the evidence of

Pegram's preexisting plan to sell 150,000 shares of Comptronix stock in November 1992.

The district court also granted judgment as a matter of law to Adler and Choy and

summary judgment to Ishler because the district court concluded that "the facts and

circumstances related to the other defendants [were] similar [to Pegram] and the principles

[were] the same."[19]


## II. DISCUSSION

We first discuss Pegram's 1989 transactions, and then discuss the 1992 transactions

involving all four appellees.

A. Pegram's 1989 Transactions

A district court's grant of summary judgment is reviewed de novo, applying the

same standards utilized by the district court. Konst v. Florida East Coast Ry. Co., 71 F.3d

850, 852 (11th Cir. 1996).  Summary judgment should be granted only "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ.

P. 56(c).

_____

[19]The district court noted that the revealed jury split was 6-1 in favor of Ishler and that there was "no need to discuss the evidence as to the other parties in detail" because the SEC had "built its case on a domino theory" and thus "[i]f the Adler-Pegram domino is not significant, the others lose significant position."

1. <u>The SEC's Legal Argument: The Knowing Possession Test</u>

The SEC argues that the district court erred as a matter of law in granting summary judgment for Pegram in regard to his 1989 transactions in Comptronix stock because, in concluding that Pegram's preexisting plan to sell stock rebutted any reasonable inference of scienter created by the suspicious timing of his sales, the district court improperly considered whether Pegram *used* inside information in his trading. The SEC argues that the district court incorrectly adopted a causal connection standard for insider trading violations that allows a trader to avoid liability if the trader proves that he did not purchase or sell securities *because of* the material nonpublic information that the trader knowingly possessed. The SEC argues that it presented evidence that Pegram knowingly possessed material nonpublic information, and thus Pegram, as a corporate director, violated the prohibition against insider trading found in § 10(b), Rule 10b-5, and § 17(a) because, "whether or not Pegram used the inside information," Pegram traded in his company's stock while *in possession* of material nonpublic information.

At the time of Pegram's September 1989 sales, it is clear that Pegram *possessed* nonpublic information. Pegram had attended the September 14, 1989, Comptronix Board meeting at which nonpublic information was disclosed to Comptronix Board members. There is a genuine issue of fact as to whether this nonpublic information was material. In determining whether knowing possession of material nonpublic information, without regard to whether this information was used or was an actual cause of the sale or purchase

of securities,[20] is sufficient to establish liability under § 10(b), Rule 10b-5, and § 17(a), we must first consider the language of these provisions.  See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 96 S. Ct. 1375, 1383 (1976) (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S. Ct. 1917, 1935 (1975) (Powell, J., concurring)).  Section 10(b) of the Securities Exchange Act of 1934 provides that

> It shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Pursuant to its rulemaking power under § 10(b), the SEC promulgated Rule 10b-5, which provides that it is unlawful for any person

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Section 17(a) of the Securities Act of 1933 provides that it shall be unlawful for any person in the offer or sale of any securities:

> (1) to employ any device, scheme, or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to

---

[20]We refer to the two competing tests in the following shorthand: the SEC's position is "the knowing possession" test, while the position advocated by Pegram is the "use" or "causal connection" test.

16

make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Although § 10(b), Rule 10b-5, and § 17(a) do not explicitly address whether mere possession of material nonpublic information at the time of trading is sufficient for establishing liability of a corporate insider, the language suggests a focus on fraud, deception, and manipulation.

Several Supreme Court decisions are relevant to our discussion. In Chiarella v. United States, 445 U.S. 222, 100 S. Ct. 1108 (1980), the Supreme Court repeated the familiar maxim that under § 10(b) a corporate insider has a duty to disclose material nonpublic information or to abstain from trading on the information. Id. at 1114 (quoting In re Cady, Roberts & Co, 40 S.E.C. 907, 911 (1961)). This "disclose or abstain" rule derives from the fiduciary duty that corporate insiders owe to the shareholders of the corporation. The SEC argues that the "disclose or abstain" rule supports its position that knowing possession of material nonpublic information while trading is sufficient to establish liability under § 10(b). However, immediately after reciting the "disclose or abstain" rule, the Chiarella court stated that an insider's duty arises from "the unfairness of allowing a corporate insider to *take advantage of* [inside] information by trading without disclosure," id. at 1114 (emphasis added) (citing In re Cady, Roberts & Co., 40 S.E.C. at 912, and n.15), and that "[t]he federal courts have found violations of § 10(b) where

17

corporate insiders *used* undisclosed information for their own benefit." Id. at 1115 (citing

SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968)).

In Dirks v. SEC, 463 U.S. 646, 662, 103 S. Ct. 3255, 3265 (1983), the Court found

that a tippee's duty to disclose or abstain "is derivative from that of the insider's duty," and

thus a tippee is only liable under § 10(b) or Rule 10b-5 for trading on the basis of material

nonpublic information if the inside tipper breached a fiduciary duty in disclosing to the

tippee. In determining whether the disclosure constituted such a breach of duty, the Court

considered whether the inside tipper personally benefitted directly or indirectly from the

disclosure to the tippee.  Id. at 3264-65 (concluding that "[a]bsent some personal gain [to

the corporate insider], there has been no breach of duty to stockholders").[21]  The Court

stated that "[n]ot only are insiders forbidden by their fiduciary relationship from

personally *using* undisclosed corporate information to their advantage, but they also may

not give such information to an outsider for the same improper purpose of *exploiting* the

information for their personal gain."  Id. at 3264 (emphasis added).  This language and the

Dirks Court's holding that an inside tipper must gain some personal advantage in order for

an outside tippee to be liable for trading on material nonpublic information, suggests that

knowing possession of material nonpublic information at the time of trading may not be

enough to establish liability for insider trading.  Furthermore, the majority and the dissent

---

[21]The Court also stated that "a purpose of the
securities laws was to eliminate 'use of inside
information for personal advantage.'" Dirks, 463 U.S.
at 662, 103 S. Ct. at 3265 (quoting In re Cady, Roberts
& Co., 40 S.E.C. 907, 912 n.15 (1961)).

18

in <u>Dirks</u> disagreed about whether motivation is relevant to proving scienter as an element of an insider trading violation. Responding to the dissent's contention that "[t]he scienter requirement addresses the intent necessary to support liability; it does not address the motives behind the intent," <u>Dirks</u>, 463 U.S. at 674 n.10, 103 S. Ct. at 3271 n.10 (Blackmun, J., dissenting), the Court stated that "contrary to the dissent's suggestion . . . motivation is not irrelevant to the issue of scienter. It is not enough that an insider's conduct results in harm to investors; rather a violation may be found only where there is 'intentional or willful conduct designed to deceive or defraud investors.'" <u>Dirks</u>, 463 U.S. at 663 n.23, 103 S. Ct. at 3266 n.23 (quoting <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. at 199, 96 S. Ct. at 1383). Finally, in <u>United States v. O'Hagan</u>, -- U.S. --, 117 S. Ct. 2199 (1997), the Court stated that "[u]nder the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation *on the basis* of material, nonpublic information. Trading *on* such information qualifies as a 'deceptive device' under § 10(b)." <u>Id.</u> at 2207 (emphasis added).[22] We acknowledge that the Supreme Court's language in <u>Chiarella</u>, <u>Dirks</u>, and <u>O'Hagan</u> is dicta, because in those cases there was no question that the material nonpublic information was actually used in trading.

---

[22] In <u>O'Hagan</u>, the Court held that liability may be based on the "misappropriation theory" because "misappropriators . . . deal in deception. A fiduciary who '[pretends] loyalty to the principal while *secretly* converting the principal's information for *personal gain*' . . . defrauds the principal." <u>O'Hagan</u>, 117 S. Ct. at 2208 (emphasis added).

19

Surprisingly, few courts have directly addressed whether §10(b), Rule 10b-5, and § 17(a) require a causal connection between the material nonpublic information and the insider's trading or whether knowing possession of material nonpublic information while trading is sufficient for liability.[23]  In <u>United States v. Teicher</u>, 987 F.2d 112, 119 (2d Cir. 1993), the two defendants, who were convicted by a jury of securities fraud, argued on appeal that "the district court's jury charge erroneously instructed the jury that the defendants could be found guilty of securities fraud based upon the mere possession of fraudulently obtained material nonpublic information without regard to whether this information was the actual cause of the sale or purchase of securities."  In discussing the

---

[23]Although few courts have directly addressed the issue, a number of commentators have expressed their views on the use versus possession debate, with the majority appearing to favor a causal connection/use standard. <u>See</u> Allan Horwich, <u>Possession Versus Use: Is There A Causation Element in the Prohibition on Insider Trading?</u>, 52 Bus. Law. 1235, 1268 (1997) (ultimately concluding, after a careful and thorough analysis of the relevant case law, that the use test is "the better rule"); 2 A. Bromberg & L. Lowenfels, <u>Securities Fraud & Commodities Fraud</u>, § 7.4(600), at 7:159, 7:160.14 (1996) (ultimately concluding, after significant analysis, that a corporate insider can introduce evidence of nonuse of material nonpublic information as an affirmative defense); 3 Arnold S. Jacobs, <u>Litigation and Practice Under Rule 10b-5</u>, §66.02[c], at 3-657 (1981) (concluding that one of the "exceptions" to the "general" disclose or abstain rule is that an "insider's decision to buy or sell must be based on his inside information"); <u>but see</u> 7 L. Loss & J. Seligman, <u>Securities Regulation</u> 3504-3505 (3d ed. 1991) (concluding, after brief analysis, that "[t]he very difficulty of establishing actual use of inside information points to possession as the test").

issue of whether a "causal connection" is a required element of a Rule 10b-5 violation, the court listed several factors which tended to support the SEC's position that a "causal connection" is not required and that a violation is established merely upon proof that a trade was conducted while the trader knowingly possessed material nonpublic information.[24]  Although it is fair to say that the Teicher court appeared to look favorably upon the SEC's suggested test, the court's discussion was clearly dicta.  The court

---

[24]The factors discussed included (1) the language of § 10(b) and Rule 10b-5 "require only that a deceptive practice be conducted 'in connection with the purchase or sale of a security'" and the "in connection with" clause has been interpreted "flexibly"; (2) a "knowing possession" test "comports" with the disclose or abstain rule; (3) an inside trader "has an informational advantage over other traders;" and (4) the difficult task that the SEC would face in attempting to prove that the inside information actually impacted the insider's investment decision. Teicher, 987 F.2d at 120-21.  We find it difficult to understand how the first factor is relevant to the choice between a knowing possession and a use test.  In light of Chiarella and Dirks, we do not believe that the third factor, an informational advantage, can be considered a significant factor in establishing a Rule 10(b) violation.  See Chiarella, 445 U.S. at 232-35, 100 S. Ct. at 1116-18 (rejecting the lower court's theory that the use by anyone of material nonpublic information results in unequal access to information, creates an unfair advantage, and thus is fraudulent; the Court held that not every instance of financial unfairness constitutes fraud under § 10(b)); Dirks, 463 U.S. at 656-57, 103 S. Ct. at 3262-63 (also rejecting the equal access to information theory).  We discuss the second and fourth factors below and conclude that they do not persuade us to adopt the knowing possession test.

expressly found that it was "unnecessary to determine whether proof of securities fraud requires a causal connection." Id. at 121.[25]

In addition to the Supreme Court's language in Chiarella, Dirks, and O'Hagan, several cases arguably provide support for the proposition that there is no violation of § 10(b) and Rule 10b-5 in the absence of some causal connection between the material nonpublic information and an insider's trading. In a number of cases, courts have allowed insiders to introduce evidence of preexisting plans or other "innocuous" reasons for sales in order to rebut an inference of scienter. In In re Worlds of Wonder Securities Litigation, 35 F.3d 1407, 1427-28 (9th Cir. 1994), the court concluded that "[e]ven if the evidence was sufficient to permit an inference that one or more of the defendants had access to inside information, the defendants' actual trading would conclusively rebut an inference of scienter." Furthermore, the court emphasized that some of the insiders "sold their shares pursuant to a predetermined plan," one insider sold "because it faced a pressing need to service a huge debt incurred from overinvesting in real estate," and another insider only

---

[25]The court in Teicher obviously found the defendants' alleged motivations for trading to be unpersuasive. The court stated, "It strains reason to argue that an arbitrageur, who traded while possessing information he knew to be fraudulently obtained, knew to be material, knew to be nonpublic--and who did not act in good faith in so doing--did not also trade on the basis of that information." Teicher, 987 F.2d at 121. By considering the defendants' alleged motivations for trading, the Teicher court applied a use/causal connection-type standard for insider trading liability.

22

sold a small percentage of his shares.  Id.; see also Dura-Bilt Corp v. Chase Manhattan

Corp., 89 F.R.D. 87, 94-95 (S.D.N.Y. 1981) (In the context of a class certification and the

defendants' argument that individual issues of fact predominated, the court indicated that a

relevant issue was whether the defendants "relied on inside information in making . . .

trading decisions."  The court stated that "[d]efendants' reliance on inside information . . .

may be inferred from a showing of defendants' possession of the information . . . [w]hile

defendants may introduce evidence to rebut this inference of use . . . .").[26]

---

[26]Pegram cites a number of other cases in support of
the proposition that a trader in possession of material
nonpublic information is able to rebut an inference of
use by producing evidence of a preexisting plan to sell
or another "innocuous" reason for trading. See, e.g.,
Searls v. Glasser, 64 F.3d 1061, 1068 (7th Cir. 1995);
Acito v. Imcera Group, Inc., 47 F.3d 47, 54 (2d Cir.
1995); Rubinstein v. Collins, 20 F.3d 160, 169 n.38
(5th Cir. 1994); In re Apple Computer Sec. Litig., 886
F.2d 1109, 1117 (9th Cir. 1989).  The SEC argues that
these cases are not applicable to the use versus
possession debate because the cases were not actions
for inside trading violations, but instead involved
actions in which the insiders' trading was introduced
as evidence of the insiders' failure to make timely
public announcements of unfavorable corporate
information or as evidence that the insiders'
disclosure of positive information was a
misrepresentation.  We agree with the SEC that these
cases cited by Pegram are not clearly applicable
because the relevant issues did not involve whether the
allegedly unfavorable inside information was the basis
or cause of the insider trading, but instead involved
whether the insiders actually possessed "negative"
material nonpublic information.

The SEC's position on whether knowing possession of material nonpublic

information while trading is sufficient to establish insider trading liability under § 10(b),

Rule 10b-5, and § 17(a) has undergone some fluctuation over time.  In In re Investors

Management Company, Inc., [1970-71 Transfer Binder] Fed. Sec. L. Rep. (CCH), ¶

78,163, at 80,514 (SEC Ruling July 29, 1971), the SEC concluded that one of the elements

of an insider trading violation under §10(b) and Rule 10b-5 is that the material nonpublic

information "be a factor in [the insider's] decision to effect the transaction."  Id. at 80,519.

In evaluating this element, the SEC stated that when an insider engages in a sale just prior

to public dissemination of adverse inside information, then an inference arises that the

information was a factor in the investment decision, but "the recipient [of the inside

information] of course may seek to overcome such evidence by countervailing evidence."

Id. at 80,522 n.28 (finding that the defendants' claims that they traded based on

"unconfirmed rumor" and "careful, painstaking analysis" of the corporation were not

sufficient to meet the defendants' "burden").[27]  In Report of the Investigation in the Matter

of Sterling Drug, Inc., [1978 Transfer Binder] Fed. Sec. L. Rep. (CCH), ¶ 81,570, at

80,295 (SEC Ruling April 18, 1978), the SEC, without mentioning its prior ruling and

without stating any rationale for its change of position, stated that "Rule 10b-5 does not

_____

[27]Commissioner Smith found that a corporate insider would not be liable under § 10(b) and Rule 10b-5 "where a firm decision to effect a transaction had been clearly made prior to the receipt of the information and the information played no substantial role in the investment decision." Investors Management Co., Inc., ¶ 81,570 at 80,524 (Smith, concurring in result).

24

require a showing that an insider sold his securities for the purpose of taking advantage of material non-public information." Id. at 80,298 (rejecting evidence of an insider's preexisting plan to sell because the SEC found that trading while in knowing possession of material nonpublic information is sufficient for an insider trading violation).[28]

We also must consider whether the provision allowing the SEC to seek treble damages, the Insider Trading Sanctions Act of 1984 ("ISTA"), helps resolve whether possession or use is the proper standard for an insider trading violation under § 10(b), Rule 10b-5, and § 17(a).  See Aaron v. SEC, 446 U.S. 680, 700, 100 S. Ct. 1945, 1957 (1980). In ISTA, Congress amended the Securities Exchange Act of 1934 to give the SEC authority to seek a civil penalty of up to three times the amount of profit gained or loss

---

[28]The SEC apparently has advocated a knowing possession standard for insider trading liability since 1978.  In testimony before Congress regarding the Insider Trading Sanctions Act of 1984, the SEC General Counsel asserted that the SEC's "consistent position has been that possession of material inside information is the test", but the SEC Chairman noted that "in terms of court decisions" the SEC has not "always won on that ground."  Insider Trading Sanctions and SEC Enforcement Legislation, Hearing on HR 559 Before Subcommittee on Telecommunications, Consumer Protection and Finance of the House Committee on Energy and Commerce, No. 98-33, 98th Cong., 1st Sess., 48-49 (1983).  In a 1983 address, the SEC General Counsel stated that the SEC "will continue to consider trading while in possession of inside information as the test of liability, not the more stringent [use] test," but acknowledged that "where the trader has a 'plausible argument that complicates proof', the SEC will be 'cautious' about bringing the case."  15 Sec. Reg. & L. Rep. (BNA) 1820, 1821 (1983).

avoided by a person who violates the federal securities laws "by purchasing or selling a security while in possession of material, nonpublic information." 15 U.S.C. § 78u-1(a) (1997). Although Congress used the language "in possession" in ISTA, numerous statements in the legislative history of ISTA disclaim any intent to modify the common law definition of an insider trading violation. H.R. Rep. No. 98-355 (1984), <u>reprinted in</u> 1984 U.S.C.C.A.N. 2274 (report of House version of ISTA, H.R. 559);[29] Insider Trading Sanctions and SEC Enforcement Legislation, <u>supra</u>, at 49 (testimony of John M. Fedders, SEC Director of Enforcement).[30] We find that ISTA's "possession" language only sets a

---

[29]The House Report stated that "[t]he legislation does not change the underlying substantive case law of insider trading as reflected in judicial and administrative holdings. . . . The Committee believes that the law with respect to insider trading is sufficiently well-developed at this time to provide adequate guidance. . . . the adoption of a statutory definition could reduce flexibility; and . . . any new definition which might be adopted would be likely to create new ambiguities, thereby increasing rather than limiting uncertainty." H.R. Rep. No. 98-355 at 2286. Congress resisted arguments from many members of the bar to define insider trading and heard much conflicting testimony regarding whether possession or use was the correct standard for § 10(b) and Rule 10b-5 liability under the case law of that time. <u>See</u> Bromberg & Lowenfels, <u>supra</u>, at 7:160.2-160.4.

[30]Mr. Fedders testified before the House Committee, which was considering the possession versus use issue, that "[t]he proposed legislation in my view goes to a remedy. It does not at the present time at all impact the existing case law with regard to insider trading. It is strictly a remedy saying that if a person engages in this insider trading, however defined, that then the amount of disgorgement can be three times the ill-

condition for the SEC to seek a treble damages civil penalty that is discretionary with the court and that is "implicitly dependent on the court finding a violation." Bromberg & Lowenfels, supra, at 7:160.3.[31] Therefore, the "in possession" language of ISTA does not resolve whether possession or use is the proper standard for an insider trading violation under § 10(b), Rule 10b-5, and § 17(a).

We view the choice between the SEC's knowing possession test and the use test advocated by Pegram as a difficult and close question of first impression. It is apparent from the foregoing discussion that there is no definitive guidance on this issue from the Supreme Court. However, we believe that Supreme Court dicta and the lower court precedent suggest that the use test is the appropriate test. The strongest argument that has been articulated in support of the knowing possession test is that a strict use test would pose serious difficulties of proof for the SEC. It is true that it often would be difficult for the SEC to have to prove that an insider used the inside information,[32] i.e., that the inside

gained profit. And the proposed language that you have before you, presented by the Commission, does not impact the 'based on,' 'in possession of,' or a 'knowing' standard at all."   Insider Trading Sanctions and SEC Enforcement Legislation, supra, at 49.

[31]Bromberg and Lowenfels state that "Congress clearly opted for possession over use as a *necessary* condition for the civil penalty.  Congress did not go so far as to make possession a *sufficient* condition for the penalty, much less for the violation."   Bromberg & Lowenfels, supra, at 7:160.4

[32] We sometimes use "inside information" in this discussion as shorthand for material nonpublic information.

information has a causal connection to a particular trade. However, we believe that the SEC's problems in this regard are sufficiently alleviated by the inference of use that arises from the fact that an insider traded while in possession of inside information.

We believe that the use test best comports with precedent and Congressional intent, and that mere knowing possession -- i.e., proof that an insider traded while in possession of material nonpublic information -- is not a per se violation. However, when an insider trades while in possession of material nonpublic information, a strong inference arises that such information was used by the insider in trading. The insider can attempt to rebut the inference by adducing evidence that there was no causal connection between the information and the trade -- i.e., that the information was not used.[33] The factfinder would then weigh all of the evidence and make a finding of fact as to whether the inside information was used.

We adopt this test for the following reasons. First, of the several arguments in support of the knowing possession test, the strongest is the fact that it often would be difficult for the SEC to prove that an alleged violator actually used the material nonpublic information; the motivations for the trader's decision to trade are difficult to prove and

---

[33] We note that if experience shows that this approach unduly frustrates the SEC's enforcement efforts, the SEC could promulgate a rule adopting the knowing possession standard, as the SEC has done in the context of tender offers, see infra note 36, or a rule adopting a presumption approach in which proof that an insider traded while in possession of material nonpublic information would shift the burden of persuasion on the use issue to the insider.

28

peculiarly within the trader's knowledge. However, we believe that the inference of use,

which arises from the fact that the insider traded while in

knowing possession of material nonpublic information, alleviates the SEC's problem.[34]

The inference allows the SEC to make out its prima facie case without having to prove the

causal connection with more direct evidence.

Second, we believe that our approach best comports with the language of § 10(b)

and Rule 10b-5, and with Supreme Court precedent. Section 10(b) of the 1934 Act

prohibits "any manipulative or deceptive device." Rule 10b-5 and § 17(a) of the 1933 Act

prohibit "any device, scheme, artifice to defraud" and "any act, practice, or course of

business which operates or would operate as a fraud." Similarly, the Supreme Court has

repeatedly emphasized this focus on fraud and deception. See O'Hagan, -- U.S. at --, 117

S. Ct. at 2209 (stating that "§ 10(b) is not an all-purpose breach of fiduciary duty ban;

rather it trains on conduct involving manipulation or deception") (citing Santa Fe

Industries v. Green, 430 U.S. 462, 473-76, 97 S. Ct. 1292, 1300-02 (1977)); Dirks, 463

U.S. at 667 n.27, 103 S. Ct. at 3268 n.27 (concluding that "to constitute a violation of Rule

10b-5, there must be fraud"); Chiarella, 445 U.S. at 234-35, 100 S. Ct. at 1118 (stating that

"[s]ection 10(b) is aptly described as a catchall provision, but what it catches must be

fraud"); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199, 96 S. Ct. 1375, 1383-84 (1976)

(concluding that "manipulative," "device," and "contrivance" in § 10(b) "connot[e]

---

[34] Thus, the fourth factor that Teicher listed as supporting the knowing possession test is undermined. See supra, note 24.

intentional or willful conduct designed to deceive or defraud investors"). When an insider

trades *on the basis of* material nonpublic information, the insider is clearly breaching a

fiduciary duty to the shareholders and deriving personal gain from the use of the nonpublic

information. On the other hand, we do not believe that the SEC's knowing possession test

would always and inevitably be limited to situations involving fraud. Indeed, O'Hagan, in

its discussion of the knowing possession test which has been adopted by the SEC in Rule

14e-3(a)[35] for the tender offer context, recognized that the knowing possession test may

prohibit actions that are not themselves fraudulent. O'Hagan, -- U.S. at --, 117 S. Ct. at

2217 (holding that "under §14(e), the Commission may prohibit acts, not themselves

fraudulent under the common law or § 10(b), if the prohibition is 'reasonably designed to

prevent ... acts and practices [that] are fraudulent'").

The SEC argues that the knowing possession test is supported by the familiar

maxim that an insider has a § 10(b) duty to disclose material nonpublic information or to

abstain from trading. However, a trade by an insider with such information does not

---

[35]Rule 14e-3(a) provides that "[i]f any person has taken a substantial step or steps to commence, or has commenced, a tender offer . . ., it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the ACT for any other person who is *in possession of* material information relating to such tender offer . . . to purchase or sell or cause to be purchased or sold any of such securities . . . unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise." 17 C.F.R. § 240.14e-3(a) (1997) (emphasis added).

always and inevitably constitute a breach of the duty. Indeed, in the very case in which

the SEC articulated the "disclose or abstain" rule, In re Cady, Roberts & Co., 40 S.E.C.

907, 911 (1961), the SEC also acknowledged a preexisting plan to sell defense; the

defense was rejected for failure of proof, not as a matter of legal principle. Id. at 916

(finding that "we do not accept [the defendants'] contention that [one of the defendants]

was merely carrying out a program of liquidating the holdings in his discretionary

accounts-determined and embarked upon prior to his receipt of the [material nonpublic]

information. . . . The record does not support the contention that [one of the defendant's]

sales were merely a continuance of his prior schedule of liquidation.") We construe In re

Cady, Roberts & Co as an acknowledgment by the SEC that the analysis we embrace

today is not inconsistent with the "disclose or abstain" rule.[36]

It is true that the SEC has stated its preference for the knowing possession test, both

in its brief to this court and in the Report of Investigation in the Matter of Sterling Drug,

Inc.. We decline to accord much deference to the SEC position for three reasons.[37] First,

the SEC has not contended in this case that we should defer to its position. Second, as

---

[36]Thus, the second factor listed by the court in Teicher as supporting the knowing possession test is undermined.

[37]In Skidmore v. Swift & Company, 323 U.S. 134, 140, 65 S. Ct. 161, 164 (1944), the Court concluded "the weight of such a[n] [agency's] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade."

noted above, the SEC position has not been consistent.  In <u>In re Investors Management</u>, the SEC initially utilized a test similar to the test we adopt today, and then in <u>Sterling Drug</u> the SEC adopted a different position with no mention of its prior ruling and no discussion of the rationale for the change.[38]  Third, the SEC has had ample opportunity to adopt a rule or amend Rule 10b-5 so as to provide that a trade with knowing possession of material nonpublic information triggers insider trading liability.  However, although the SEC has adopted such a rule in the context of tender offers,[39] it has not formally adopted the knowing possession test for insider trading.  Rather, the SEC has articulated its knowing possession test only in the context of a "report of investigation," which provided no reasoning and was not even binding on the parties to that matter.  <u>Report of Investigation in the Matter of Sterling Drug, Inc.</u>, ¶ 81,570, at 80,295 (stating that "[t]he investigation on which this Report is based was in no sense an adjudicatory proceeding . . . [n]or is the report a determination of the rights or liabilities of any person").

In sum, we believe that the strong inference of use which arises from the fact that an insider traded while in possession of material nonpublic information suffices to

---

[38]Even now, the SEC apparently is "cautious" about bringing cases where a trader has a plausible argument that he did not use the inside information.  <u>See</u> <u>supra</u>, note 28.

[39]In Rule 14e-3, the SEC adopted a knowing possession test for trading on information related to tender offers. <u>See</u> <u>supra</u>, note 35.

alleviate the SEC's difficulties in proving use. We believe that our approach best comports with the statutory focus on fraud. See Chiarella, 445 U.S. at 243-35, 100 S. Ct. 1118 ("[s]ection 10(b) is . . . a catchall, but what it catches must be fraud"). Furthermore, we do not believe our approach is inconsistent with the "disclose or abstain" doctrine, and we do not believe deference to the SEC position in Sterling Drug is warranted.

## 2. The SEC's Factual Argument

We turn now to the application of the test to the facts involved in Pegram's 1989 transactions. On the dates of Pegram's 1989 sales, it is clear that Pegram was in possession of whatever information was dispensed at the September 14, 1989, Board meeting. Although there is a genuine issue of fact as to the materiality of this information, we agree with the district court that in the summary judgment posture of this case, we must assume that the factfinder could find that Pegram possessed material nonpublic information. Under the test we adopt today, the fact that Pegram traded while he possessed material nonpublic information gives rise to a strong inference that such information was used. Of course, the inference can be rebutted. Pegram has adduced strong evidence that he had a plan to sell 20,000 shares of Comptronix stock and that the plan predated his acquisition at the September 14, 1989, board meeting of the material nonpublic information. However, after a careful review of this summary judgment record, and in light of the strong inference that Pegram would have used that information in finalizing his sale decision, we conclude that genuine issues of material fact remain for a jury to decide (e.g., whether the information hastened the timing of Pegram's decision to

33

sell or affected the price at which he was willing to sell).  Accordingly, the grant of summary judgment in favor of Pegram as to the 1989 transactions is reversed.

B. 1992 Transactions of Pegram, Choy, and Ishler

Unlike the action against Pegram regarding his 1989 transactions, the SEC's action against Pegram, Choy, Ishler, and Adler regarding their 1992 transactions in Comptronix stock went to trial.  After a seven day jury trial, the jury's inability to reach a verdict, and the district court's declaration of a mistrial, the district court granted judgment as a matter of law to Pegram, Choy, and Adler and summary judgment to Ishler.[40]

We review a decision to grant a motion for judgment as a matter of law de novo, applying the same standards utilized by the district court.  Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436, 439 (11th Cir. 1996), cert. denied, 117 S. Ct. 2511 (1997).  A judgment as a matter of law is warranted "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."  Fed. R. Civ. P. 50(a)(1).  When evaluating a motion for judgment as a matter of law, the court "must consider all of the evidence and reasonable inferences arising therefrom in the light most favorable to the nonmoving party" and "may not weigh the evidence or decide the credibility of witnesses."  Isenbergh, 84 F.3d at 439.  However, the nonmoving party "must provide

_____

[40]The district court granted Ishler's motion for summary judgment based on all the evidence introduced at trial, see supra, note 18.

34

more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" Id. (quoting Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)).

### 1. Pegram's 1992 Transactions

The SEC contends that during the 72 second telephone call from Pegram to Adler on November 16, 1992, Adler tipped Pegram about the potential fraud that was disclosed at Comptronix's November 15 Board meeting. This telephone call is the primary alleged source of material nonpublic information for Pegram. The issue before us is whether a reasonable jury could find on this evidence that Adler tipped Pegram during that telephone call. The SEC contends that the timing of the telephone calls between Pegram and Adler, and Pegram and his wife, and his wife's immediate sale of the stock, as well as the similar scenario preceding Choy's sale of Comptronix stock, combine to raise an inference that Pegram possessed material nonpublic information. The SEC argues that a jury issue remained notwithstanding Pegram's preexisting plan to sell Comptronix stock in November 1992.

In order to establish liability under § 10(b), Rule 10b-5, and § 17(a)(1), the SEC must prove that the inside trader acted with "scienter." E.g., Aaron v. SEC, 446 U.S. 680, 695-696, 100 S. Ct. 1945, 1955 (1980). Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." Id. at 1950 n.5. Scienter necessarily requires that the insider have possession of material nonpublic information at the time the insider trades. See SEC v. MacDonald, 699 F.2d 47, 49 (1st Cir. 1983). Moreover, as we hold

today in Part II.A.1, the SEC must also prove that the material nonpublic information was used in the trade. However, proof of an insider's possession of material nonpublic information at the time of a trade gives rise to a strong inference of use. With respect to the 1992 transactions, we discuss first the issue of Pegram's possession of the information, and then the use issue.

Pursuant to well established law, the SEC raised a reasonable inference that Pegram possessed nonpublic information by producing evidence of the suspicious timing of Pegram's 1992 sale of Comptronix stock and evidence of the phone calls between Adler, Pegram, and Pegram's wife. See, e.g., Freeman v. Decio, 584 F.2d 186, 197 n.44 (7th Cir. 1978); In re Apple Computer Sec. Litig., 886 F.2d 1109, 1117 (9th Cir. 1989) ("Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter."). This inference that Pegram possessed inside information also finds support in the Pegram-Choy telephone call and the immediately following sale by Choy.

However, it is also well established that this inference of possession is rebuttable. In Freeman v. Decio, 584 F.2d 186 (7th Cir. 1978), a stockholder of a corporation brought a derivative action against certain officers and directors of the corporation for allegedly trading in the stock of the corporation on the basis of material inside information. After concluding that the plaintiff could not maintain a derivative action for insider trading under state law, the court considered the plaintiff's argument that "the district erred in considering evidence of the defendants' past patterns of sales of [the corporation's] stock

36

and their motivations for making the sales in question." Id. at 197. In rejecting the

plaintiff's argument, the court concluded that

> When it is shown that an insider made a sudden sale of a significant portion of his holdings of his corporation's stock and that subsequently, material adverse information became public concerning the corporation which led to a significant drop in the price of the stock, an inference arises that the insider was "bailing out" on the basis of material inside information. However, this inference can be nullified by a showing that sales in question were consistent in timing and amount with a past pattern of sales or that other circumstances might reasonably account for their occurrence. Hence, the district court was correct to consider these factors.

Id. at 197 n.44. See also In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1427-28 (9th

Cir. 1994) (concluding that where an inference of possession of material nonpublic

information and scienter arises from sales of stock prior to financial collapse, credible and

wholly innocent explanations for the sales--e.g., sales pursuant to a predetermined plan,

because of a pressing need to service a huge debt or sale of only a small fraction of

holdings--can rebut the inference of possession).[41]

Thus, precedent and common sense indicate that where an inference of possession

of inside information arises from the suspicious timing of the sale, a credible and wholly

innocent explanation for said sale and timing tends to rebut the inference. In applying this

---

[41]    Although in Worlds of Wonder, the court affirmed the grant of summary judgment in favor of the alleged inside trader, the different facts of the instant case leave a jury issue. In Worlds of Wonder, the inference of possession was based primarily on the fact that the insiders sold stock shortly before the public announcement of unfavorable information; in the instant case, in addition to the fact that the defendants sold stock shortly before the public announcement of unfavorable information, the inference is supported by the phone calls from Pegram to Adler, Pegram to his wife, and Pegram to Choy.

37

legal principle, we have carefully reviewed the evidenced adduced at trial. Considering all reasonable inferences in favor of the SEC, as we must in the posture of this motion by Pegram for judgment as a matter of law, we conclude that a reasonable jury could find that Adler tipped Pegram and thus that Pegram possessed material nonpublic information. The SEC first emphasizes the evidence that Adler possessed material nonpublic at the time of the November 16, 1992, telephone call with Pegram.[42] Although the telephone call lasted only 72 seconds, a jury could find that sufficient time existed for Adler to convey material nonpublic information to Pegram. The following suspicious chronology raises a reasonable inference that Pegram received such information from Adler:

      - the 7:53 a.m. telephone call between Pegram and Adler on November 16, 1992;

      - the 7:55 a.m. telephone call on the same day from Pegram to his wife;

      - the 8:07 a.m. telephone call on the same day from Mrs. Pegram to her stockbroker placing the order to sell 50,000 shares of Comptronix stock;

      - the Pegrams' sale of an additional 100,000 shares between November 18 and November 24, 1992.

This inference that Pegram possessed material nonpublic information is also supported by the chronology of telephone calls relating to Choy and Choy's stock sale:

---

[42] We conclude without need for further discussion that there is a jury issue as to whether the information that Adler learned during the November 15, 1992, Comptronix Board meeting was material.

38

- Pegram's telephone call to Choy at 8:02 p.m. on November 16, 1992, the same day as the Pegram-Adler call;

- Choy's 9:39 p.m. fax on the same day to his stockbroker directing the sale of Choy's 5000 shares of Comptronix stock.

Thus, based on this suspicious sequence of events, an inference arises that Pegram received material nonpublic information from Adler. However, the inference can be rebutted. Pegram has adduced strong evidence that he and his wife had a plan to sell Comptronix stock, and that the plan predated the alleged tip on November 16, 1992. In addition, Pegram has adduced evidence of innocent explanations for each of the relevant telephone calls. Although Pegram's evidence is strong, we cannot conclude that a reasonable jury was required as a matter of law to believe every detail of the plan as asserted by Pegram,[43] nor was the jury required to believe the allegedly innocent explanations for the telephone calls.

Having concluded that a reasonable jury could find that Pegram received material nonpublic information from Adler, we also conclude, for similar reasons, that a reasonable jury could find that Pegram used the information in connection with his November 1992 sale of 150,000 shares of Comptronix stock (e.g., that there was a causal relationship

---

[43]As noted above, the inference that Pegram possessed the inside information arises not only from the chronology surrounding the Pegrams' sales, but also from the chronology of the Pegram-Choy call and the immediately following sale by Choy. The preexisting plan to sell by the Pegrams does nothing to rebut the latter inference.

between the inside information and the time of Pegram's sale or the price at which Pegram was willing to sell).

We conclude that these fact-intensive issues should be decided by a jury, which is in the position to observe the demeanor of witnesses and make appropriate credibility determinations. Accordingly, the judgment as a matter of law in favor of Pegram as to the 1992 transactions is reversed.

2. Choy's 1992 Sale of Comptronix stock

As indicated above, at 8:02 p.m. on the evening of November 16, 1992, Pegram called Phillip Choy. At 9:39 p.m. that same evening, Choy telefaxed the brokerage firm for his company, Magatronic Trading Limited, and directed his stockbroker to sell 5000 shares of Comptronix stock. This order was executed on November 17 and 19. Choy contends that he had a preexisting plan to sell his Comptronix stock in late 1992.[44] Having held that a reasonable jury could find that Pegram possessed and used material nonpublic

---

[44] Choy introduced evidence indicating that in September 1992, Choy contacted his stockbroker at Prudential Securities regarding the price of 5000 shares of Comptronix stock that Prudential held on behalf of Choy's company, Magatronic Trading Limited. Choy's stockbroker replied that he had received internal approval from Prudential for the sale of the Comptronix stock and that Choy should contact him if he wanted to sell. Choy's stockbroker also sent Rule 144 forms to Choy and informed Choy that he would have 90 days from the date of submitting the forms to sell the Comptronix stock. Choy faxed his stockbroker and stated that he would submit the Rule 144 forms when he wished to sell the shares. In mid-October, Choy's stockbroker informed Choy that Comptronix stock had reached a new high. However, it was not until the evening of November 16, that Choy placed his order to sell the 5000 shares and then submitted the Rule 144 forms on the next day.

information in connection with his 1992 trading, we readily conclude that Choy's relatively weak evidence of a preexisting plan is not sufficient to rebut the inference that he received material nonpublic information from Pegram and then used that information in connection with his decision to sell 5000 shares of Comptronix stock. Therefore, the district court's grant of judgment as a matter of law in favor of Choy is reversed.

3. Ishler's 1992 Transaction; Adler's Judgment as a Matter of Law

The SEC alleged that Domer Ishler received material nonpublic information from either Pegram or Adler, and that Ishler purchased 300 "put options" in Comptronix stock on the basis of this inside information.[45] In granting judgment as a matter of law to Ishler, the district court relied on its rejection of the Pegram-Adler allegation. Because we have found a jury issue in that regard, the district court's reasoning has been undermined. Ishler has proffered no evidence of a preexisting plan to buy Comptronix put options, and argues only that his purchase of the put options was consistent with evidence of his prior trading in options and other high-risk investments. This evidence is clearly not sufficient to rebut the reasonable inference that Ishler possessed and traded on the basis of material nonpublic information. This inference arises from the evidence of the multiple calls between Ishler and Adler during mid-November 1992, the November 23, 1992, phone call from Pegram to Adler, and the timing of Ishler's purchase of Comptronix put options after the telephone calls and immediately before the Comptronix press release that caused the

---

[45] See supra note 17 for a discussion of Ishler's purchase of Comptronix put options.

41

stock price to plummet dramatically.[46]  Therefore, we conclude that there is a genuine

issue of fact as to whether Ishler possessed and traded on material nonpublic information,

and we reverse the district court's grant of summary judgment in favor Ishler.

Finally, based on the above evidence and reasoning, we also conclude that the

district court erred in granting judgment as a matter of law to Adler.  In other words, a

reasonable jury could find that Adler communicated material nonpublic information to

Pegram and/or to Ishler, who then traded upon it.[47]  Accordingly, we reverse the grant of

summary judgment to Ishler and reverse the grant of judgment as a matter of law to

Adler.[48]

---

[46]  We note that Ishler's purchase of Comptronix put options was a bet that
the price of Comptronix would fall.

[47]Ishler and Adler argue that the district court's
grant of summary judgment to Ishler and judgment as a
matter of law to Adler should be affirmed because the
full extent of the fraud at Comptronix was not known at
the time of the November 15, 1992, Board meeting, and
thus the information learned by Adler at this meeting
was not material.  We reject this argument as without
merit because there is a genuine issue of fact as to
the materiality of the nonpublic information learned by
Adler at the Board meeting.  Furthermore, we also note
that the SEC produced evidence that Ishler and Adler
communicated on both November 15 and November 23 and
that by November 23, Adler had learned the full extent
of the fraud at Comptronix.

[48]We also reject the appellees' argument that the
SEC must prove any claims for treble damages under the
Insider Trading Sanctions Act of 1984 ("ISTA") by clear
and convincing evidence.  In Herman & MacLean v.
Huddleston, 459 U.S. 375, 388-91, 103 S. Ct. 683, 690-

42

III. CONCLUSION

---

92 (1983), the Court established that plaintiffs in civil actions under § 10(b) of the Securities Exchange Act of 1934 need prove their cases only by a preponderance of the evidence. The Court concluded that clear and convincing evidence should be required only in proceedings "where particularly important individual interests or rights are at stake" and that "imposition of even severe civil sanctions that do not implicate such [individual] interests has been permitted after proof by a preponderance of the evidence." Id. at 691. Although Huddleston was decided before Congress passed ISTA, Congress expressed approval for the preponderance standard in the legislative history of ISTA:

> Some commentators expressed the view that, in light of the potential for a large penalty, the appropriate burden of proof in a civil penalty action brought by the Commission under the legislation should be more than the 'preponderance of the evidence' standard applicable to Commission injunctive actions. The Committee rejects this notion because a higher proof standard could hamper Commission penalty actions. The Supreme Court has expressly approved of the preponderance of the evidence standard in governmental civil penalty suits. The civil penalty proposed here is distinct in nature from those types of judicial action on which higher proof standards have been imposed.
> The Committee believes that, since the bill provides a new sanction, and makes no change to the underlying law, no additional language is required in the statute to express the intent of Congress that the preponderance of the evidence standard be applied to penalty actions brought under the legislation.

H.R. Rep. No. 98-376 (1984), reprinted in 1984 U.S.C.C.A.N. 2274, 2288-89 (citations omitted).

43

For the foregoing reasons, we reverse the grant of summary judgment in favor of Pegram with respect to the 1989 transactions; and with respect to the 1992 transactions, we reverse the grant of judgment as a matter of law in favor of Pegram, Choy, and Adler, and we reverse the grant of summary judgment in favor of Ishler.[49] We remand for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

---

[49] In light of our disposition of this case, we also briefly address the SEC's evidentiary arguments. First, we conclude that the trial court did not abuse its broad discretion under Fed. R. Evid. 403(b) by excluding evidence relating to Pegram's alleged insider trading in 1989 from the trial regarding the 1992 transactions. Second, in regard to the other evidentiary rulings challenged by the SEC on appeal, we also conclude that the district court did not abuse its broad discretion.